**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

ANGELINA FOSBINDER,

       Plaintiff,

  vs.

UNITED STATES TENNIS
ASSOCIATION
INCORPORATED, USTA
PLAYER DEVELOPMENT
INCORPORATED, and TAYLOR
WINGATE.

       Defendants.

_____/

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, GAILA FOSBINDER, hereby files this Complaint against the United States Tennis Association ("USTA"), the USTA Player Development Incorporated ("USTA PD), and Taylor Wingate ("Wingate"), (collectively, the "Defendants"), and states as follows:

### JURISDICTION, VENUE, AND PARTIES

1.  Plaintiff is a citizen of North Carolina.

2.  Defendant USTA is a New York Corporation with its primary place of business in the City of White Plains, State of New York, and City of Orlando, State of Florida, and is therefore a citizen of New York and Florida.

1

3. Defendant USTA PD is a New York Corporation with its primary place of business in the City of Orlando, State of Florida, and is therefore a citizen of New York and Florida.[1]

4. Defendant Taylor Wingate is an individual who, at all times relevant, resided in South Carolina and was acting within the course and scope of his affiliation with and/or authority granted by the USTA. Upon information and belief, Defendant Wingate is a current citizen of Maryland.

5. The Court has subject matter jurisdiction of this action pursuant to 20 U.S.C. §1332(a) because the parties are citizens or entities from different states, and the amount in controversy exceeds $75,000.

6. Venue is proper in the Orlando Division of the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants USTA and USTA PD are residents of Orlando, Florida, and Defendants are corporations subject to the personal jurisdiction of this District

## BACKGROUND

### A. The United States Tennis Association

7. Defendants USTA have been selected by statutory authority to act as the National Governing Body ("NGB") of the sport of tennis.

8. As the NGB of tennis, USTA is the sole entity charged with the governance of the sport. As part of that role, the USTA disseminates the rules for

---

[1] The USTA and USTA PD are referred to hereinafter as the USTA Defendants or simply the USTA.

the sport and is responsible for overseeing and enforcing those rules and codes of conduct. The USTA maintains exclusive jurisdiction to set and enforce eligibility requirements for participation in the sport.

9.     Membership in USTA is required for any athlete who wishes to compete in any sanctioned tournament in the United States or abroad, or to compete in Olympic or Paralympic games.

10.     Defendant USTA PD is an affiliate and subsidiary component of the USTA responsible for identifying, training, funding, and developing elite American tennis athletes, including wheelchair tennis athletes, for national and international competition. The stated mission of USTA Player Development is to educate and train young athletes through a structured developmental pathway and high-performance training system designed to cultivate top American players. USTA Player Development actively recruits, evaluates, supervises, and supports elite athletes whom it identifies as prospective national and international representatives of the United States. USTA funds and controls USTA PD as part of its broader mission as the NGB for tennis in the United States.

11.     The USTA PD invites only top-performing athletes to participate in its prestigious Player Development Program. Athletes selected for the Program receive substantial benefits and support from the USTA and USTA PD, including financial assistance for coaching, training, travel, tournament participation, sports medicine, and other developmental resources intended to advance the athlete's competitive career. In exchange for these benefits, participating athletes are

3

required to comply with extensive program requirements and conditions imposed by USTA PD. Among other obligations, athletes must fulfill all participation requirements established by the Program; make themselves available, if selected, to exclusively represent the United States in international competitions, including junior events, World Team Cup, Parapan American Games, and Paralympic Games; prioritize U.S. and international competitions throughout their tennis careers; submit to physical evaluations requested by USTA PD; submit to drug testing; and grant the USTA and USTA PD perpetual rights to use the athlete's name, likeness, image, voice, biography, and related identifying information for promotional and commercial purposes related to the USTA, USTA PD, and the sport of tennis. Through these requirements, the USTA and USTA PD exercised substantial authority, influence, and control over athletes participating in the Program, including Plaintiff.

### B. USTA's Governance of Wheelchair Tennis

12. Wheelchair tennis originated in 1976 and has since developed into what is widely recognized as the most professionalized adaptive sport in the world.

13. Today, wheelchair tennis is played at the highest competitive levels worldwide. BNP Paribas World Team Cup, the wheelchair equivalent of the Davis Cup and Billie Jean King Cup, is contested annually by more than forty national teams representing over twenty countries, making it among the largest and most prestigious disabled sporting event globally, second only to the Paralympic Games.

14.    As the NGB of tennis, the USTA governs wheelchair tennis in the United States. In that role, the USTA exercises exclusive authority over wheelchair tennis governance in the US, including eligibility requirements, competition pathways, rankings, and international representation.

15.    The USTA sanctions wheelchair tennis tournaments throughout the country, creating competitive opportunities for players of all skill levels.

16.    As it does with able-bodied athletes, the USTA PD selects and invites the top-performing wheelchair tennis athletes in the United States to participate in its prestigious Player Development Program.

17.    Sexual abuse of the nation's highest-performing athletes has long been recognized as a widespread and systemic problem within elite-level sports.

## C. Athlete Protections

18.    In 2010, the United States Olympic Committee ("USOC") formally notified its NGBs, including the USTA, of the urgent need to strengthen athlete-protection and child-safeguarding measures following multiple sexual-abuse allegations across the Olympic movement.

19.    Beginning in 2011, the USOC specifically recommended that NGBs expand disqualifying criteria for prospective coaches and adopt stronger abuse-prevention policies designed to protect vulnerable athletes. Despite these warnings, the USTA resisted implementing many of the USOC's recommended reforms.

20. In late 2012, the USOC again reiterated the need for immediate and meaningful safeguards, describing sexual abuse by coaches as a growing "crisis" within Olympic sports. Once again, the USTA failed and refused to adopt the recommended protective measures.

21. Among the USOC's proposed safeguards was a policy prohibiting coaches from engaging in romantic or sexual relationships with their athletes. The USOC recognized that such relationships inherently involve power imbalances and create a foreseeable risk that coaches would exploit their authority to engage in inappropriate sexual conduct with vulnerable athletes. While many NGBs adopted this policy, the USTA vehemently opposed it, in part because multiple coaches within its sport were known to be dating or engaging in relationships with their athletes.

22. In or about 2013, the United States Olympic Committee ultimately compelled the USTA to implement minimum athlete-protection measures as a condition of its continued status as an NGB. In response, the USTA created what it termed its "Safe Play" program.

23. In promulgating the Safe Play program, the USTA expressly acknowledged that "tennis . . . can result in high-risk environments for misconduct, including physical, emotional, and sexual abuse." This admission reflected the USTA's recognition that athletes under its authority, particularly young and dependent athletes, face a foreseeable risk of abuse absent meaningful safeguards.

6

24.     The USTA's Safe Play Conduct, Policies & Guidelines prohibit sexual misconduct, emotional and physical misconduct, and other inappropriate conduct.

25.     Despite these measures, reports of sexual abuse within Olympic and elite sports continued to surface nationwide. In response to widespread public outrage and systemic failures by NGBs to adequately protect athletes, Congress enacted the Safe Sport Authorization Act of 2017, codified at 36 U.S.C. §§ 220541–220544, to create a centralized and independent mechanism for athlete protection.

26.     The SafeSport Act established the United States Center for SafeSport (the "Center") and vested it with exclusive authority to investigate and resolve allegations of sexual misconduct and abuse within the U.S. Olympic and Paralympic Movement. Pursuant to its statutory mandate, the Center promulgated the SafeSport Code for the U.S. Olympic and Paralympic Movement (the "SafeSport Code"), which sets forth mandatory standards of conduct, reporting obligations, and abuse-prevention requirements applicable to NGBs, including the USTA. The Center also created the Minor Athlete Abuse Prevention Policies ("MAAPP").

27.     Under the MAAPP, one-on-one interactions between a minor and a coach must be limited, and all electronic communications between a minor athlete and a coach must be open and transparent, meaning that the minor's parents or guardians must be copied on the communications.

28.     Under the SafeSport Code, an athlete cannot legally consent to sexual activity where a power imbalance exists.

29.    The SafeSport Code expressly provides that a power imbalance is presumed to exist throughout a coach–athlete relationship, regardless of the athlete's age. Because of the inherent authority, trust, dependence, and control exercised by a coach over an athlete, any sexual contact between a coach and an athlete is deemed non-consensual as a matter of policy and law.

30.    The USTA's Safe Play Policies & Guidelines adopt and incorporate all of the SafeSport Code's provisions.

### D. Plaintiff Angelina ("Gaila") Fosbinder

31.    Plaintiff Gaila Fosbinder was born on April 11, 2003, in Ukraine and was born with arthrogryposis multiplex congenita, a congenital condition affecting the joints and muscles. As a result of this condition, Plaintiff has endured numerous surgeries and permanent physical disabilities.

32.    Plaintiff was adopted at the age of four from a Ukrainian orphanage and was raised by her adoptive mother in the United States.

33.    Plaintiff began playing tennis at the age of eight. By the age of sixteen, the physical limitations caused by arthrogryposis multiplex congenita required Plaintiff to compete exclusively in wheelchair tennis.

34.    As a junior wheelchair athlete, Plaintiff emerged as one of the top-performing wheelchair tennis players in the United States, achieving elite national and international recognition at a young age.

35.     In 2019, Plaintiff was selected by the USTA as one of only seventeen junior athletes nationwide to participate in Net Generation Aces, a youth tennis ambassador and development program operated and controlled by the USTA.

36.     In September 2021, Plaintiff was invited to represent the United States on its Junior Team at the World Team Cup held in Sardinia, Italy. That same year, Plaintiff was named Female Wheelchair Tennis Junior of the Year by the International Tennis Federation.

37.     At the height of her junior career, Plaintiff achieved a world junior ranking of No. 10 in wheelchair tennis.

38.     As a direct result of her athletic success and elite status, USTA invited Plaintiff to participate in the USTA Player Development Program, through which Plaintiff received grants and other financial support used to fund her coaching, training, and tournament participation.

39.     In or around 2022, Plaintiff was invited by Jason Harnett, then-Chair of Wheelchair USTA Player and Coach Development, to become a member of the National USTA Collegiate Team, a USTA-supported initiative intended to develop elite wheelchair tennis athletes for collegiate, national, and international competition.

40.     In January 2022, Plaintiff was selected by USTA Player and Coach Development ("USTAPCD") to receive a High Performance Wheelchair Collegiate Grant through the USTA Wheelchair High Performance Program. The grant program was reserved for athletes identified by USTA wheelchair coaching staff as

demonstrating exceptional potential for future participation in international team and individual competitions representing the United States.

41. As part of this program, Plaintiff attended the USTA High Performance Wheelchair Developmental–Collegiate Training Camp in April 2022, where she trained with other elite wheelchair athletes under the supervision and direction of USTA-affiliated coaches and personnel.

42. At the urging and encouragement of USTA personnel and representatives, Plaintiff accepted an offer to attend Virginia Tech to assist in establishing and expanding a collegiate adaptive and wheelchair tennis program. In doing so, Plaintiff declined opportunities from other universities with more established wheelchair tennis programs. Upon information and belief, the USTA had a substantial institutional interest in expanding collegiate wheelchair tennis programs nationwide and had received grant funding and institutional support intended to advance adaptive collegiate tennis opportunities.

43. Plaintiff accepted the opportunity at Virginia Tech after significant encouragement and pressure from USTA representatives, who emphasized the importance of Plaintiff's participation in helping advance the USTA's goals for collegiate wheelchair tennis development and adaptive athletics visibility.

44. Upon arriving at Virginia Tech, Plaintiff became one of the foundational athletes associated with the university's adaptive tennis initiative and helped promote adaptive athletics on campus and within the collegiate tennis

community. Plaintiff publicly advocated for expanded adaptive sports opportunities and greater inclusion for athletes with disabilities.

45.    In 2023 and 2024, Plaintiff helped lead and represent Virginia Tech in national wheelchair tennis competitions and assisted in bringing the university's adaptive tennis program to national-level collegiate tournaments and events.

**E. Defendant Taylor Wingate**

46.    Defendant Taylor Wingate is a wheelchair tennis coach who has been involved in USTA tennis programs since at least 2015. In 2016, Wingate obtained coaching certification through the Professional Tennis Registry ("PTR") and thereafter began offering tennis instruction to wheelchair athletes.

47.    In or about 2016, Wingate began working at the Rock Hill Tennis Center, a USTA member organization and USTA-affiliated tennis facility. Wingate served as a tennis instructor and coach at the Rock Hill Tennis Center through approximately 2024. From at least 2020 through 2021, Wingate also served as a member of the USTA South Carolina Board of Directors.

48.    The USTA has repeatedly held Wingate out to the public, its members, and junior athletes as a certified, USTA-approved instructor, including through official USTA publications and programs.[2] The USTA publicly identified Wingate

---

[2] *See, e.g.*, USTA Southern Section, Wheelchair Tennis Newsletter (Aug. 2023) (identifying Wingate as a USTA-affiliated wheelchair tennis coach and ambassador); USTA, USTA Awards Grants to Wheelchair Tennis Programs (publicly describing Net Generation Wheelchair Ambassadors and USTA-approved instructors), available at: https://www.usta.com/content/dam/usta/sections/southern/pdf/USTA_Southern_wh eelchair_tennis_newsletter_August_2023.pdf;    https://www.usta.com/en/home/stay-

as an "Ambassador" for its Net Generation Wheelchair Ambassadors Program, a program in which Plaintiff was invited to participate as a junior athlete. Wingate was selected by the USTA to serve as a member of the USTA Wheelchair Tennis Committee for the USTA Southern region.[3]

49.    The USTA promoted the Net Generation program as providing "family-friendly, safe, and clear connections to the sport through official USTA tennis programs." In his role as a Net Generation Ambassador, Wingate was tasked by the USTA with helping to develop and grow wheelchair tennis at the junior and grassroots level, including by collaborating with USTA-affiliated organizations, creating new programs, and expanding outreach within the adaptive sports community.

50.    At all relevant times, Wingate acted with the actual and apparent authority of the USTA and USTA-affiliated programs. Athletes, including Plaintiff, were encouraged by the USTA to view Wingate as a trusted, vetted, and USTA-endorsed coach and mentor.

### F. Wingate's Sexual Exploitation of Plaintiff

51.    Plaintiff began receiving coaching advice from Defendant Taylor Wingate when she was sixteen (16) years old. At that time, Wingate was thirty-two (32) years old and held himself out as a certified, USTA-approved coach. He

---

current/national/usta-awards-grants-to-33-wheelchair-tennis-programs.html#tab=tournaments.

[3] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.usta.com/content/dam/usta/sections/southern/pdf/2021_22_committees_070522.pdf

worked with a local wheelchair tennis program providing tennis instruction to Plaintiff and other players and, as such, had authority over Plaintiff's athletic development. Wingate later provided Plaintiff with individual coaching instruction and became Plaintiff's primary coach.

52.    Soon after beginning the coach-athlete relationship, Wingate began blurring clear professional boundaries, engaging in inappropriate conduct that included sending Plaintiff overly complimentary messages and communications containing sexually suggestive content, inconsistent with any legitimate coaching purpose.

53.    In 2019, while attending a tennis tournament sanctioned and governed by the USTA in South Carolina, and while Plaintiff was still sixteen years old, Wingate directed Plaintiff to sit on his lap and placed his hands on her thighs in a flirtatious and sexualized manner.

54.    These actions constituted inappropriate physical contact between a coach and a minor athlete and were open, obvious, and observable by other USTA members, participants, and employees present at the tournament. Despite the visibility of Wingate's conduct, no immediate corrective or protective action was taken to safeguard Plaintiff.

55.    Wingate continued to blur and erode the boundaries of the coach-athlete relationship by engaging Plaintiff through text messages and social-media communications that were unrelated to legitimate coaching and that degraded the professionalism of the relationship.

56. In these communications, Wingate repeatedly told Plaintiff that she was "mature for her age," praised her in a personal and flirtatious manner, and emphasized how "great" she was in ways that went beyond appropriate athletic encouragement. Wingate sent flirtatious texts and emojis and initiated discussions about romantic and sexual relationships with women, topics that were developmentally inappropriate for a minor athlete and wholly inconsistent with a professional coaching role.

57. None of these communications complied with MAAPP policies, the SafeSport Code, or USTA's Safe Play Policies, which all prohibit private, personal, sexualized, or grooming communications between coaches and minor athletes. Wingate's conduct violated these policies and further entrenched the power imbalance inherent in the coach-athlete relationship.

58. Plaintiff does not recall receiving any training, education, or guidance from the USTA, USTA PD, or any affiliated program regarding appropriate interactions between minor athletes and adult coaches, how to identify grooming behaviors, or what steps to take if an adult member abused, groomed, or exploited her.

59. At all relevant times, Wingate was certified by the United States Center for SafeSport and was required to complete extensive athlete-safety education and training as a condition of his continued participation in USTA-affiliated programs and activities. This certification process included coursework regarding athlete protection, mandatory reporting obligations, the heightened

vulnerability of minor and dependent athletes, the inherent power imbalance in coach-athlete relationships, and the identification and prevention of grooming behaviors. Wingate was required to renew his SafeSport certification yearly.

60. As part of his training and certification, Wingate was educated that "grooming" refers to a pattern of manipulative behaviors used to gain an athlete's trust, create emotional dependence, normalize inappropriate conduct, isolate the athlete from support systems, and facilitate sexual exploitation or abuse. The training further identifies grooming behaviors to include excessive personal attention, favoritism, gift-giving, private electronic communications, discussions of sexual topics, boundary violations, and efforts to create secrecy or exclusivity within the coach-athlete relationship. Despite receiving this education and training, Wingate nevertheless engaged in the precise grooming behaviors that the SafeSport program was designed to identify and prevent.

61. After months of increasingly familiar, complimentary, and inappropriate communications initiated by Wingate, and other grooming behaviors, Plaintiff—then a minor—felt significant pressure to maintain closeness with Wingate and to please him both on and off the court. This pressure arose, at least in part, from Wingate's position of authority over Plaintiff's training, competitive opportunities, and athletic advancement, as well as his age, influence, and status within the tennis community. Plaintiff's youth, inexperience with intimate relationships, physical disabilities, and dependence on trusted adults

within the elite wheelchair tennis community further contributed to her vulnerability to Wingate's grooming and exploitation.

62.    As the relationship progressed, Plaintiff began traveling alone with Wingate to tournaments and taking personal day trips with him, outside the presence of parents, guardians, or other responsible adults. During these trips, Wingate provided Plaintiff with alcohol and marijuana and gave her personal gifts, further deepening Plaintiff's dependence on him and reinforcing the power imbalance inherent in their relationship.

63.    Shortly after Plaintiff turned eighteen (18), the relationship became physically intimate. In early 2022, after Plaintiff had become intoxicated from alcohol provided by Wingate, Plaintiff and Wingate engaged in sexual intercourse.

64.    From that point forward, and continuing until approximately June 2024, Wingate and Plaintiff exchanged sexually explicit photographs and text messages, engaged in sexual conversations, and maintained an ongoing sexual relationship, all while Wingate continued to serve as Plaintiff's coach.

65.    During this period, Wingate coached Plaintiff at numerous USTA-sanctioned tournaments and Wingate and Plaintiff attended USTA-related social events, where the relationship was open and obvious. USTA members and employees knew or should have known the nature of the relationship and that Wingate's relationship violated the USTA's and the SafeSport Code's prohibition of coach/athlete relationships. Throughout this time, Wingate maintained his

position of authority and influence over Plaintiff's athletic career while engaging in prohibited sexual conduct.

66. After a coaching lesson in June 2024, Plaintiff terminated both the coaching relationship and the sexual relationship with Defendant Wingate.

67. On June 24, 2024, the USTA abruptly informed Plaintiff that she was being removed from the Player Development Program. The decision was sudden and unexpected and was communicated in the middle of the night through email communication without any face-to-face meeting, telephone call, or other meaningful communication from the USTA regarding the reasons for her removal. Upon information and belief, Plaintiff alleges that the abrupt termination of her position in the Player Development Program was related to the end of her relationship with Defendant Wingate and/or the circumstances surrounding that relationship.

68. In or around August 2024, Plaintiff contacted the Center for SafeSport to inquire about making a report for misconduct by a coach. Following the guidance from the Center for SafeSport, on September 13, 2024, Plaintiff filed an incident report to the United States Center for SafeSport related to the grooming and sexual exploitation committed by Defendant Wingate.

69. On October 2, 2024, the United States Center for SafeSport accepted jurisdiction to investigate the relationship between Wingate and Plaintiff and imposed temporary measures, including prohibiting Wingate from communicating with Plaintiff and barring him from engaging in one-on-one

communications with any athletes, among other restrictions. The Center thereafter conducted a thorough investigation spanning over a year, which included the review of documents, electronic communications, witness interviews, and other evidence relating to Wingate's conduct and his relationship with Plaintiff.

70.    On January 29, 2025, the Center updated the temporary measures, temporarily suspending Wingate from participation, in any capacity, in any program, activity, event, or competition sponsored by or organized by the USTA or any other NGB.

71.    While the Center for SafeSport's investigation remained ongoing, Plaintiff attempted to reconnect with local tennis groups and programs in which she had previously participated and from which she had received support and community. Plaintiff was informed by leaders and organizers associated with those groups that they had been advised by the USTA that they could not "take sides" and that Plaintiff should not discuss the circumstances surrounding Wingate or the SafeSport investigation at any events sponsored by these local tennis groups. The totality of these communications and actions caused Plaintiff to feel ostracized, isolated, and effectively silenced within the sport of tennis and deprived her of the support and community she had previously relied upon.

72.    During the pendency of the Center for SafeSport's investigation, and despite the temporary measures and restrictions imposed against him, Wingate continued to be identified within the USTA community as an active wheelchair tennis coach. Upon information and belief, USTA sectional websites and affiliated

programs continued to promote Wingate as a "head coach" for workshops and events involving wheelchair athletes, thereby continuing to hold him out as an approved and endorsed coach notwithstanding the ongoing SafeSport investigation and imposed restrictions.

73.    While the SafeSport investigation remained ongoing—and while Wingate was publicly listed by the Center as temporarily prohibited from participating, in any capacity, in any program, activity, event, or competition sponsored by the USTA—the USTA nevertheless invited Wingate to attend the 2025 US Open and provided him access to the USTA President's Box, a prestigious privilege typically reserved for prominent and honored members of the tennis community. Wingate's inclusion in the President's Box during the USTA's premier tournament conveyed institutional endorsement and support for Wingate despite the serious allegations and ongoing investigation. To Plaintiff, the USTA's actions minimized the gravity of her allegations, undermined her confidence in the reporting process, and reinforced the perception that the USTA prioritized protecting favored coaches and insiders over safeguarding athletes who report abuse and misconduct.

74.    Following a 12-month, extensive investigation, the Center determined, by a preponderance of the evidence, that Wingate violated the SafeSport Code by, among other things: engaging in private communications with Plaintiff while she was a minor; engaging in a non-platonic relationship with Plaintiff when she was a minor and a young adult athlete when a power imbalance

19

existed; providing Plaintiff with alcohol when she was under the age of 21; and engaging in prohibited and nonconsensual sexual activity with an athlete during the existence of a coach-athlete relationship. As a sanction, the Center for SafeSport permanently banned Wingate from participating in any event organized or authorized by the USOPC or the USTA.

75. Following that decision, Wingate appealed the Center for SafeSport's determination to a neutral arbitrator pursuant to the Center's policies and procedures. After a two-day evidentiary arbitration hearing, the arbitrator upheld the Center's decision in full, including the sanction of lifelong permanent ineligibility.

76. To this day, the USTA continues to identify Wingate as a head coach for USTA-affiliated workshops and continues to hold him out as an approved, endorsed, and affiliated wheelchair tennis coach despite his permanent ineligibility and lifetime ban from participation in sport imposed by the United States Center for SafeSport.

77. The totality of Wingate's conduct and the abusive coach-athlete relationship have caused Plaintiff significant and lasting harm, including severe emotional distress, psychological trauma, anxiety, humiliation, and loss of self-esteem. Plaintiff's mental and emotional health have been profoundly affected, resulting in harm to her personal relationships, academic pursuits, sense of safety, and her previously deep love for and participation in the sport of tennis.

78. Plaintiff has suffered, and continues to suffer, from anxiety and panic attacks, which are triggered in part by reminders of tennis, competitive athletics, and coach-athlete interactions. As a result of the trauma associated with Defendants' conduct, Plaintiff withdrew from participation in Virginia Tech's collegiate wheelchair team, causing substantial disruption to a newly developing adaptive athletics program in which Plaintiff had played a foundational role. Plaintiff now experiences significant fear, distrust, and anxiety regarding coaches and athletic institutions, which has substantially impaired her ability to participate in sports and has deprived her of a lifelong source of pride, accomplishment, identity, and joy.

79. Upon information and belief, prior to and independent of Wingate's relationship with Plaintiff, other USTA members and athletes, including a USTA employee, experienced instances of inappropriate behavior by Wingate, including conduct inconsistent with professional coaching standards and athlete-protection policies. Despite this prior history, the USTA failed to take reasonable corrective or protective action, including failing to investigate, discipline, restrict, suspend, or otherwise limit Wingate's access to minor and vulnerable athletes, thereby allowing Wingate's misconduct to continue unabated.

## COUNT I: NEGLIGENCE
### (against Defendants USTA and USTA PD)

80. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-78 above.

21

81.    Defendants USTA and USTA PD owed Plaintiff duties imposed by common law, federal athlete-protection statutes, the SafeSport Authorization Act, 36 U.S.C. §§ 220541–220544, the SafeSport Code for the U.S. Olympic and Paralympic Movement, the Minor Athlete Abuse Prevention Policies ("MAAPP"), and the USTA's own Safe Play policies and procedures, all of which were enacted and implemented for the protection of minor and vulnerable athletes, including Plaintiff.

82.    As the NGB for tennis in the United States, the USTA was required to adopt, implement, supervise, and enforce policies designed to protect athletes from sexual abuse, grooming, exploitation, and misconduct by coaches and individuals acting under the authority or auspices of the USTA and its affiliated programs. These duties included, among other things, compliance with the SafeSport Code and MAAPP requirements governing coach-athlete interactions, reporting obligations, supervision, and athlete safety.

83.    The duties imposed by the SafeSport Act, the SafeSport Code, MAAPP, and the USTA's Safe Play policies were intended to protect athletes such as Plaintiff from the precise type of grooming, sexual exploitation, abuse of authority, and emotional harm suffered by Plaintiff in this case.

84.    Defendants USTA and USTA PD exercised substantial authority, supervision, and control over Plaintiff's athletic development, participation opportunities, training environment, and access to elite competition through the Player Development Program and related USTA activities.

22

85.    At all relevant times, Defendants USTA and USTA PD exercised substantial authority, supervision, and control over Wingate through his status as a USTA-certified coach, USTA SafeSport-certified participant, USTA ambassador, committee member, state representative for wheelchair tennis, and participant in USTA-affiliated programs and activities. The USTA authorized Wingate to serve in athlete-facing leadership and coaching roles, publicly endorsed him as a trusted and approved representative of the organization, and retained the authority to supervise, monitor, discipline, restrict, suspend, or remove him from such positions and activities.

86.    Defendants USTA and USTA PD breached their duties of care and violated duties imposed by the SafeSport Act, the SafeSport Code, MAAPP, and the USTA's own Safe Play policies by, among other things:

    a. Failing to protect Plaintiff from sexual misconduct conducted by Wingate;

    b. Failing to enforce procedures and policies aimed at the protection of minors and young adult athletes;

    c. Failing to investigate complaints of sexual misconduct within the sport;

    d. Failing to investigate previous allegations of misconduct against Wingate;

    e. Failing to notify athletes of coaches that have engaged in inappropriate sexual conduct with USTA athletes;

f. Failing to educate athletes and families about the risks of grooming behaviors and sexual misconduct from adult coaches;

g. Failing to take corrective action after observing inappropriate contact between Plaintiff and Wingate when Plaintiff was a minor;

h. Failing to take reasonable corrective or protective action, including failing to investigate, discipline, restrict, suspend, or otherwise limit Wingate's access to minor and vulnerable athletes, after obtaining knowledge of inappropriate conduct from other athletes;

i. Failing to enforce policies and procedures for the protection of young adult female athletes by allowing sexual misconduct to occur at USTA-sanctioned tournaments in an open and obvious manner;

j. Failing to implement and/or enforce proper policies and procedures for the protection of athletes thereby creating and protecting a culture of inappropriate coach-athlete relationships;

k. Failing to intervene to prevent the escalation of inappropriate conduct towards Plaintiff by Wingate;

l. Failing to exercise reasonable care to detect when actions or behavior of a coach are detrimental to athletes' wellbeing or their general safety;

24

m. Failing to exercise reasonable care to detect that actions or behavior of a coach, including Wingate, are unprofessional, unethical, or illegal;

n. Failing to exercise appropriate and reasonable care in granting coaching privileges to Coaches to perform unsupervised/unchaperoned coaching and non-coaching activities to athletes including Plaintiff;

o. Allowing Wingate to provide Plaintiff with alcohol while underage at USTA events;

p. Failing to warn Plaintiff that Wingate presented a foreseeable risk of harm;

q. Failing to support and protect Plaintiff after she reported misconduct by Wingate, including isolating Plaintiff within the tennis community, discouraging discussion of her allegations within USTA-affiliated groups, and taking retaliatory actions against Plaintiff, including abruptly removing her from the Player Development Program;

r. Continuing to hold Wingate out as an approved, endorsed, and affiliated wheelchair tennis coach even after the United States Center for SafeSport suspended and later permanently banned him from participation in sport;

s. Failing to exercise reasonable care to detect, prevent, report, and remediate abusive conduct prohibited under the SafeSport Code and MAAPP;

t. Otherwise failing to comply with athlete-protection duties imposed by federal law, SafeSport policies, and the USTA's own adopted safeguarding procedures

87. As a direct and proximate result of the foregoing negligence of the Defendants, Plaintiff was sexually groomed, harassed, and assaulted by Defendant Wingate, suffered severe emotional distress, psychological trauma, loss of self-esteem, and other damages, including impacts to her education, social relationships, and participation in the sport of tennis. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

88. The conduct of Defendants USTA and USTA PD was willful, wanton, reckless, and in conscious disregard of Plaintiff's rights and safety, thereby entitling Plaintiff to recover compensatory damages, punitive damages, costs, and all other relief permitted by law.

### COUNT II: NEGLIGENT RETENTION
### (against Defendants USTA and USTA PD)

89. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-78 above.

90. At all times material, Defendant Wingate acted as an authorized representative, agent, apparent agent, ambassador, committee member, coach,

and/or individual acting under the authority, auspices, endorsement, and control of Defendants USTA and USTA PD.

91. Defendants USTA and USTA PD selected, endorsed, authorized, supervised, promoted, and retained Wingate in positions that provided him with access to junior and vulnerable athletes, including Plaintiff, through USTA-sanctioned tournaments, programs, workshops, committees, and athlete-development initiatives.

92. At all relevant times, Defendants USTA and USTA PD exercised, or retained the right to exercise, authority and control over Wingate's participation in USTA-affiliated activities, including the authority to supervise, monitor, discipline, restrict, suspend, remove, or otherwise limit his involvement with athletes participating in USTA programs and events.

93. Prior to and during Wingate's misconduct toward Plaintiff, Defendants USTA and USTA PD knew or reasonably should have known that Wingate was unfit to serve in positions of trust and authority involving young and vulnerable athletes. Upon information and belief, Defendants had observed and/or obtained other information indicating that Wingate engaged in inappropriate conduct inconsistent with professional coaching standards prior to the formation of the coach-athlete relationship was formed between Wingate and Plaintiff.

94. Defendants USTA and USTA PD nevertheless negligently retained, endorsed, and continued to hold Wingate out as an approved and trusted wheelchair tennis coach and representative despite knowledge of facts that would

have caused a reasonable organization exercising ordinary care to investigate, discipline, restrict, suspend, or remove him from athlete-facing roles.

95. The USTA likewise observed inappropriate contact between Wingate and Plaintiff at USTA-sanctioned events, including observing Plaintiff sitting on Wingate's lap when Plaintiff was 16 years old.

96. Despite observing this inappropriate physical contact between a coach and minor athlete, Defendants further negligently failed to adequately supervise and monitor Wingate's interactions and communications with Plaintiff.

97. Even after the initiation of the SafeSport investigation and the imposition of temporary measures against Wingate, Defendants continued to publicly identify and promote him as an approved and affiliated wheelchair tennis coach and continued to allow him to be associated with USTA-affiliated programs and workshops.

98. Defendants USTA and USTA PD knew, or reasonably should have known, that their continued retention, endorsement, and inadequate supervision of Wingate created a foreseeable and unreasonable risk of harm to Plaintiff and other athletes participating in USTA programs.

99. As a direct and proximate result of Defendants' negligent retention and failure to supervise Wingate, Plaintiff was groomed, manipulated, sexually exploited, abused, and otherwise harmed by Wingate and suffered severe emotional distress, psychological trauma, humiliation, loss of self-esteem, and other damages, including impacts to her education, personal relationships, and

participation in the sport of tennis. The losses are permanent or continuing in nature, and Plaintiff will continue to suffer such losses in the future.

100.   The conduct of Defendants USTA and USTA PD was willful, wanton, reckless, and in conscious disregard of Plaintiff's rights and safety, thereby entitling Plaintiff to recover compensatory damages, punitive damages, costs, and all other relief permitted by law.

### COUNT III: BATTERY
### (against Defendant Taylor Wingate)

101.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-76 above.

102.   At all relevant times, Defendant Taylor Wingate intentionally and unlawfully engaged in harmful and offensive physical contact with Plaintiff, of which she could not legally consent.

103.   While Plaintiff was a minor, and while Wingate was acting as Plaintiff's coach and authority figure, Wingate engaged in inappropriate and sexualized physical contact with Plaintiff, including directing Plaintiff to sit on his lap and placing his hands on her thighs in a flirtatious and sexual manner.

104.   Wingate's conduct was intentional, unwanted, and objectively offensive, and occurred within the context of a coach–athlete relationship characterized by a significant power imbalance.

105.   Wingate further committed battery by engaging in sexual acts with Plaintiff during the period in which he continued to serve as her coach and exercise

29

authority, influence, and control over her athletic development, training, and competitive opportunities.

106. Plaintiff's purported "consent," if any, was not legally valid because it was obtained through grooming, exploitation of authority, and an inherent power imbalance that precluded meaningful consent as a matter of law and policy.

107. Wingate's acts were undertaken willfully, knowingly, and with reckless disregard for Plaintiff's rights, bodily autonomy, and well-being.

108. As a direct and proximate result of Wingate's battery, Plaintiff suffered severe emotional distress, psychological trauma, loss of self-esteem, and other damages, including impacts to her education, social relationships, and participation in the sport of tennis. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## COUNT IV: BATTERY
### (Vicarious Liability against Defendants USTA and USTA PD)

109. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-78 above.

110. At all relevant times, Defendant Taylor Wingate acted as an agent, apparent agent, representative, ambassador, committee member, coach, and/or authorized participant acting under the authority, auspices, endorsement, and control of Defendants USTA and USTA PD.

111. Defendants USTA and USTA PD selected, endorsed, authorized, supervised, promoted, and publicly held Wingate out as a trusted and approved

wheelchair tennis coach and representative through USTA-affiliated programs, committees, workshops, and athlete-development initiatives.

112.    At all relevant times, Wingate used the authority, access, trust, influence, and opportunities conferred upon him through his relationship with the USTA and USTA PD to develop, cultivate, and maintain his relationship with Plaintiff. Wingate's interactions with Plaintiff occurred within the context of USTA-sanctioned tournaments, coaching activities, developmental programs, training opportunities, and other activities conducted under the authority and auspices of the USTA and USTA PD.

113.    As alleged herein, Wingate intentionally engaged in harmful and offensive physical contact with Plaintiff, including inappropriate sexualized touching while Plaintiff was a minor and subsequent sexual conduct occurring within the context of the ongoing coach-athlete relationship.

114.    Wingate's conduct was accomplished, facilitated, and enabled by the authority, access, apparent legitimacy, and trust bestowed upon him by Defendants USTA and USTA PD. Wingate used his status as a USTA-approved and USTA-endorsed coach to gain Plaintiff's trust and dependence and to create opportunities for abuse and exploitation.

115.    At all relevant times, Wingate acted with apparent authority and purported to act on behalf of, and in furtherance of, his role within USTA-affiliated programs and athlete-development activities. Plaintiff reasonably believed that

31

Wingate was acting with the approval, endorsement, and authority of the USTA and USTA PD.

116. By virtue of the agency relationship, apparent authority relationship, and/or authority conferred upon Wingate by Defendants USTA and USTA PD, Defendants are vicariously liable for Wingate's tortious conduct toward Plaintiff.

117. As a direct and proximate result of Wingate's battery and Defendants' vicarious liability for that conduct, Plaintiff suffered severe emotional distress, psychological trauma, humiliation, loss of self-esteem, and other damages, including impacts to her education, relationships, and participation in athletics and the sport of tennis. The losses are permanent or continuing in nature, and Plaintiff will continue to suffer such losses in the future.

118. The conduct described herein was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights and safety, thereby entitling Plaintiff to recover compensatory damages, punitive damages, costs, and all other relief permitted by law.

## COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (against Defendant Wingate)

119. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-78 above.

120. At all relevant times, Defendant Taylor Wingate engaged in intentional and reckless conduct that was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized society.

32

121. Wingate occupied a position of trust, authority, and power over Plaintiff as her coach, mentor, and USTA-endorsed instructor, while Plaintiff was a minor, a wheelchair athlete, and a dependent participant in elite USTA programs.

122. Wingate intentionally exploited this power imbalance by grooming Plaintiff, blurring professional boundaries, engaging in sexually suggestive communications, initiating inappropriate physical contact, providing Plaintiff—while she was underage—with alcohol and marijuana, and fostering emotional dependence for his own sexual gratification.

123. Wingate's conduct culminated in sexual acts and an ongoing sexual relationship while he continued to serve as Plaintiff's coach, maintained authority over her athletic opportunities, and coached her at USTA-sanctioned tournaments, conduct that is expressly prohibited by SafeSport policies and universally recognized as abusive.

124. Wingate knew, or acted in reckless disregard of the fact, that his conduct was substantially certain to cause Plaintiff severe emotional distress, particularly given her age, disability, vulnerability, and reliance on him for training, advancement, and approval within the sport.

125. Wingate's actions were not isolated or accidental, but rather constituted a pattern of deliberate manipulation, exploitation, and abuse over several years.

126. As a direct and proximate result of Wingate's extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including psychological

trauma, anxiety, depression, loss of self-esteem, impairment of personal relationships, disruption of her education, and loss of enjoyment of and participation in the sport of tennis.

127. Plaintiff's emotional distress is severe, enduring, and of a nature that no reasonable person should be expected to endure.

128. Wingate's conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights and well-being, entitling Plaintiff to recover compensatory damages, punitive damages, costs, and such other relief as the Court deems just and proper.

**COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Vicarious Liability against Defendants USTA and USTA PD)**

129. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-78 above.

130. At all relevant times, Defendant Taylor Wingate acted as an agent, apparent agent, representative, ambassador, committee member, coach, and/or authorized participant acting under the authority, auspices, endorsement, and control of Defendants USTA and USTA PD.

131. Through official USTA programs, committees, workshops, and developmental initiatives, Defendants USTA and USTA PD publicly held Wingate out as a trusted, approved, and authorized representative of the USTA and encouraged athletes, including Plaintiff, to rely upon and trust him in matters

involving athletic training, mentorship, advancement, and participation opportunities.

132. As alleged herein, Wingate engaged in extreme and outrageous conduct toward Plaintiff, including grooming behaviors, inappropriate communications, exploitation of a significant power imbalance, provision of alcohol and marijuana to Plaintiff while she was underage, and the maintenance of a sexual relationship while acting as Plaintiff's coach and authority figure within the USTA athlete-development structure.

133. Wingate's conduct was facilitated, enabled, and made possible through the authority, access, credibility, trust, and influence conferred upon him by Defendants USTA and USTA PD through their endorsement and placement of Wingate in athlete-facing leadership and coaching roles.

134. Plaintiff reasonably believed that Wingate was acting with the authority, endorsement, and approval of Defendants USTA and USTA PD and relied upon the legitimacy and trust associated with Wingate's USTA-affiliated positions.

135. By virtue of the agency relationship, apparent authority relationship, and/or authority conferred upon Wingate by Defendants USTA and USTA PD, Defendants are vicariously liable for Wingate's intentional and outrageous conduct toward Plaintiff.

136. As a direct and proximate result of Wingate's conduct and Defendants' vicarious liability for that conduct, Plaintiff suffered severe emotional distress,

psychological trauma, anxiety, panic attacks, humiliation, loss of self-esteem, isolation from the tennis community, and other damages, including impacts to her education, personal relationships, adaptive athletics participation, and continued involvement in the sport of tennis. The losses are permanent or continuing in nature, and Plaintiff will continue to suffer such losses in the future.

137. The conduct described herein was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights and well-being, thereby entitling Plaintiff to recover compensatory damages, punitive damages, costs, and all other relief permitted by law.

**COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(against Defendants USTA and USTA PD)**

138. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-78 above.

139. After Plaintiff reported Wingate's misconduct to the United States Center for SafeSport, Defendants USTA and USTA PD engaged in intentional and reckless conduct that was extreme and outrageous and exceeded all bounds of decency tolerated in a civilized society.

140. Rather than supporting and protecting Plaintiff after she reported sexual misconduct by a USTA-endorsed coach, the USTA Defendants engaged in conduct designed to isolate, silence, and marginalize Plaintiff within the wheelchair tennis community. Upon information and belief, USTA representatives and affiliated organizations communicated to local tennis groups and community leaders that they could not "take sides" and that Plaintiff should not discuss the

circumstances surrounding Wingate or the SafeSport investigation within those groups.

141. The USTA Defendants knew, or recklessly disregarded, that Plaintiff relied upon the wheelchair tennis community as a primary source of support, identity, mentorship, and social connection and that discouraging discussion of her allegations and isolating her from that community would foreseeably cause severe emotional harm.

142. At the same time, despite the ongoing SafeSport investigation, the temporary restrictions imposed against Wingate, and ultimately his permanent lifetime ban from sport, the USTA continued to publicly identify and promote Wingate as an approved and endorsed wheelchair tennis coach. Upon information and belief, USTA-affiliated websites and programs continued to list Wingate as a "head coach" for wheelchair athlete workshops and continued to hold him out to the public as a trusted and affiliated coach even after the Center determined that he had engaged in prohibited misconduct with Plaintiff.

143. Further, while Wingate was publicly listed by the Center for SafeSport as suspended from participation in USTA events and while he remained under investigation for sexual misconduct involving Plaintiff, Defendants nevertheless invited Wingate to attend the US Open and provided him access to the USTA President's Box, a prestigious privilege generally reserved for honored and prominent members of the tennis community. The USTA Defendants' decision to publicly honor and associate with Wingate during the pendency of the

investigation conveyed institutional endorsement and support for Wingate despite the seriousness of the allegations against him and the restrictions already imposed by SafeSport.

144. The USTA Defendants' conduct communicated to Plaintiff, other athletes, and the broader tennis community that Defendants prioritized protecting the reputation and status of Wingate over the safety, dignity, and well-being of Plaintiff, the athlete who reported the abuse. Defendants' actions further undermined Plaintiff's confidence in the reporting process and reinforced the perception that the USTA favored coaches and insiders over athletes who report misconduct.

145. The USTA Defendants further acted outrageously and in reckless disregard of Plaintiff's rights and well-being by abruptly removing Plaintiff from the Player Development Program without meaningful explanation or communication, conduct that Plaintiff reasonably understood as retaliatory and connected to her relationship with Wingate.

146. The USTA Defendants knew, or acted in reckless disregard of the substantial likelihood, that their conduct would cause Plaintiff severe emotional distress, humiliation, anxiety, isolation, and psychological trauma, particularly given Plaintiff's vulnerability as a young wheelchair athlete whose personal identity, career opportunities, and support system were deeply tied to the USTA tennis community.

147.   As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff suffered severe emotional distress, psychological trauma, humiliation, loss of self-esteem, isolation from the tennis community, and other damages, including harm to her educational pursuits, personal relationships, and continued participation in the sport of tennis. The losses are permanent or continuing in nature, and Plaintiff will continue to suffer such losses in the future.

148.   The conduct of Defendants USTA and USTA PD was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights, thereby entitling Plaintiff to recover compensatory damages, punitive damages, costs, and all other relief permitted by law.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, prejudgment interest, punitive damages, attorneys' fees, costs of this action, and such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable as a matter of right.

Dated: May 21, 2026                    Respectfully submitted,

/s/ Amy L. Judkins                 .
Amy L. Judkins, Esq.
Florida Bar No. 125046
**NORMAND, JUDKINS, &
COUCH, PLLC**
3165 McCrory Place, Suite 175
Orlando, Florida 32803
(407) 603-6031
alj@normandpllc.com
evan.cassidy@normandpllc.com
Jacqueline M. Bertelsen, Esq.
Florida Bar No. 123747

39

**NORMAND, JUDKINS, & COUCH, PLLC**
3165 McCrory Place, Suite 175
Orlando, Florida 32803
(407) 603-6031
j.bertelsen@njc.law

*Attorneys for Plaintiff*